**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

BRIAN GORMAN,                                    *

    Plaintiff,                                   *

v.                                               *                    Case No. 1:25-cv-03157

TOWSON UNIVERSITY,                               *
    Office of the General Counsel
    8000 York Road                               *
    Towson, MD 21252
                                                 *

    <u>**Served on:**</u>
    Office of the Attorney General               *
    Civil Litigation Division
    200 St. Paul Place                           *
    Baltimore, MD 21202
                                                 *

KIMBERLEY SCHATZEL                               *
    10 Brooklets Ave.                            *
    Easton, MD 21601
                                                 *

MELANIE PERREAULT                                *
    210 Saltgrass Dr.                            *
    Glen Burnie, MD 21060
                                                 *

CHRIS CHULOS                                     *
    506 Dunkirk Road                             *
    Baltimore, MD 21212
                                                 *

NATHAN BARKER                                    *
    129 Chesapeake Cove Lane                     *
    Elkton, MD 21921
                                                 *

MARION HUGHES                                    *
    7608 Far Hills Drive                         *
    Baltimore, MD 21286
                                                 *

DOUGLAS PRYOR                                    *
    8801 Stone Ridge Cir.                        *
    Unit 101
    Pikesville, MD 21208                         *

1

ELIZABETH CLIFFORD                  *
    32 Willow Ave.
    Towson, MD 21286               *

MATTHEW DURINGTON                   *
    6 Drew Ct.
    Baldwin, MD 21013              *

MICHELLE MANASSE                    *
    3507 Buena Vista Ave
    Baltimore, MD 21211            *

MICHAEL ELLIOTT                     *
    916 Overbook Road
    Baltimore, MD 21239            *

SAMUEL COLLINS                      *
    132 Greenridge Rd.
    Lutherville, MD 21093,         *

    Defendants.                     *

*   *   *   *   *   *   *   *   *   *   *   *   *

## **COMPLAINT**

COMES NOW, Mr. Brian Gorman (the "Plaintiff" or "Professor Gorman"), by and through his undersigned counsel, brings this action against Towson University (the "Defendant" or "Towson"), Douglas Pryor ("Pryor"), Samuel Collins ("Collins"), Matthew Durington ("Durington"), Michelle Manasse ("Manasse"), Michael Elliott ("Elliott"), Elizabeth Clifford ("Clifford"), Marion Hughes ("Hughes"), Kim Schatzel ("Schatzel"), Melanie Perreault ("Perreault"), Chris Chulos ("Chulos"), and Nathan Barker, Esq for violations of 42 U.S.C. § 1983, breach of contract, wrongful termination against public policy, and related claims, and in support states as follows:

2

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. §1331 because this is a civil action arising under the Constitution, law, or treaties of the United States.

2. This Court has supplemental jurisdiction over State law claims in this action under 28 U.S.C. §1367, as the claims arise from the same case or controversy for which the Court has jurisdiction over as federal questions.

3. Venue is proper in this judicial district under 28 U.S.C. §§1391(b) because the violations of 42 U.S.C. § 1983 and unlawful termination was committed in this district. The Defendants conduct business in this judicial district and the events giving rise to this cause of action occurred in this judicial district.

## PARTIES

4. The Plaintiff, Brian Gorman, is a male United States citizen, currently residing in the State of New York, who was formerly employed by Towson as a tenured Associate Professor.

5. Defendant is Towson University, a public university located at 8000 York Road, Towson, MD 21252.

6. The Defendant, Douglas Pryor, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

7. The Defendant, Elizabeth Clifford, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

8.  The Defendant, Matthew Durington, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

9.  The Defendant, Michelle Manasse, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

10. The Defendant, Michael Elliott, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

11. The Defendant, Samuel Collins, is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

12. The Defendant Marion Hughes is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

13. The Defendant, Nathan Barker, Esq. is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

14. The Defendant Melanie Perreault is an employee of Towson University located at 8000 York Road, Towson, MD 21252.

15. The Defendant Kimberly Schatzel was an employee of Towson University located at 8000 York Road, Towson, MD 21252 and currently resides in Easton, Maryland.

## FACTUAL BACKGROUND

16. On or about August 2006, Professor Brian Gorman ("Professor Gorman") began his employment with Towson University ("Defendant") as an Assistant Professor of Criminal Justice in the Sociology, Anthropology and Criminal Justice Department on a tenure track of 6 (six) years.

17. Professor Gorman taught a variety of courses at Towson University including, Introduction to Criminal Justice, Advanced Criminal Law, Biocrime and Security, and White-Collar Crime.

18. On or about 2012, Defendant promoted Professor Gorman from an Assistant Professor to a tenured Associate Professor.

19. Defendant's Policy on Appointment, Rank, and Tenure of Faculty ("ART Policy") governing Professor Gorman's position states that tenure "is an indefinite appointment granted by the President that shall be terminated only due to misconduct or under other extraordinary causes."

20. The ART Policy describes misconduct as "'moral turpitude', professional or scholarly misconduct, incompetence, or willful neglect of duty."

21. On or about January 18, 2021, Professor Gorman emailed Dean Christopher Chulos ("Chulos") with a complaint regarding job search "CLA-3407," a tenure-track faculty position in Criminal Justice. Professor Gorman noted a potential conflict of interest regarding Criminal Justice Search Committee members Antunes and Manasse, along with the appearance of bias by Clifford, and Elliott. Professor Gorman's notice was ignored and job search CLA-3407 did fail soon thereafter in late Spring due to faculty misconduct.

22. Prior to Professor Gorman's January 18, 2021 complaint, sometime in the Fall semester of 2020, he raised concern directly with colleagues regarding concerns of misconduct related to the forthcoming job search, CLA-3407. The

problems persisted and Professor Gorman submitted the "Conflict of Interest" complaint.

23. Professor Gorman's January 18, 2021 complaint notified Chulos about the potential for retaliation by Antunes, Manasse, Clifford, and Elliott because of Gorman's objections to improprieties within the department prior to, and during the CLA-3407 job search.

24. On or about Jan. 20, 2021, Chulos acknowledged receipt of the complaint and stated that he read Professor Gorman and would respond.

25. On or about February 4, 2021, Professor Gorman sent notice to Sam Collins and Matthew Durington, an unofficial leadership team within the department, about concerns regarding misconduct and further retaliation against Professor Gorman during the "Third Year Review" of another colleague, Kilmer. (All senior faculty in the department with tenure are expected to sit on the department's PTR Committee for the Third Year Review of an Assistant Professor on tenure track.)

26. On February 5, 2021, the PTR Committee convened for Kilmer's "Third Year Review." Professor Gorman tried to participate in the Review but was denied the opportunity, despite it being a standard obligation for tenured professors like himself. On February 8, 2021, Professor Gorman sent an email objecting to his exclusion from the Kilmer review.

27. On or about February 8, 2021, a complaint by other faculty, undisclosed to Professor Gorman, objected to Gorman's concerns of being removed from the

Kilmer review process. On or about February 24, 2021, faculty filed an HR complaint against Professor Gorman alleging an attempt to 'shut down' 'equity issues' and 'disparage' his 'colleagues' reputations' through his whistleblowing reports dated Nov. 27, 2020, Feb. 5, 2021, and Feb. 8, 2021.

28. On or about March 16, 2021, Goodman, an HR representative for Towson, found the allegations against Professor Gorman unsubstantiated; however, she did find that his whistleblowing reports did make his colleagues disgruntled with him.

29. Professor Gorman was informed that he would not be recommended for a Merit increase to his salary. On or about Mar. 17, 2021. Professor Gorman had a Zoom meeting with Chulos about the "No Merit" recommendation. On or around March 18, 2021, Professor Gorman submitted an appeal to Chulos regarding this issue; he later re-sent an appeal request on April 7, 2021 after Chulos denied receipt of an appeal.

30. On or about April 26, 2021, Professor Gorman sent a memo to University Counsel, carbon copied to Hughes, Chulos, Jones, and Associate Provost, Shaunna Payne-Gold, who attended the final meeting to select a winning candidate for job search CLA-3407. Gorman reported the following: Payne-Gold opened the meeting by requesting that faculty disclose any relationships with applicants for the faculty position. Professor Antunes confessed to having a professional relationship with one of the candidates, that had been divulged to only some colleagues in the department.

31. On or about May 6, 2021, Hughes requested a telephone meeting with Professor Gorman. She presented questions allegedly prepared by Chulos asking whether Professor Gorman reported concerns over CLA-3407 to the Office of Legal Counsel and HR. Professor Gorman submitted an internal "Ethics Point" referral on the Dean's alleged inquiry presented by Hughes over reporting misconduct.

32. On or about May 2, 2021, Professor Gorman submitted secondary appeals over the 2019-2020 Merit denial on procedural and substantive grounds to demonstrate differential treatment and breach of contract for Upper Administration and external authorities. He relied upon the department's 2018 Merit document providing written standards for "Base Merit" qualification.

33. On or about June 15, 2021, Professor Gorman received Towson University's "final refusal" of the appeal of the denial of his Merit increase.

34. On or about June 17, 2021, Professor Gorman made an appeal to the Chancellor of the University System of Maryland to override President Schatzel and Provost Perreault, by allowing Professor Gorman to take his Merit appeal to a fair hearing at the Office of Administrative Hearings (OAH) for state employees.

35. On or about Aug. 2, 2021, the Chancellor's Office of the USM replied that they had no authority to override the University Administration's decision,

which denied both internal and external review of the appeal through a fair hearing at the OAH.

36. On or about Aug. 31, 2021, at 9:00 AM, Jones, the head of HR agreed to hear Professor Gorman and hosted a four-way meeting with Professor Gorman, Hughes, and Chulos to discuss Gorman's concerns. On or about September 10, 2021, Professor Gorman attended the second four-way meeting with Hughes, Chulos, and Jones, over the dysfunctional and hostile environment.

37. On or about October 2, 2021, Professor Gorman received "No Merit" designation, despite easily surpassing minimum criteria for "Base Merit."

38. The Merit Committee willfully disregarded overwhelming evidence including his existing book contract and sample chapter, and instead provided vague pretextual feedback alleging an "unsatisfactory record."

39. Manasse had previously told Gorman that "anyone who goes against the department will never see a pay increase for the rest of their life."

40. On or about January 14, 2022, Professor Gorman submitted his 5-year Comprehensive Review per the ART Policy Appendix 3.

41. The ART Policy requires all tenured faculty to submit a comprehensive five-year review once every five (5) years, that contains a summary for a period of the preceding five (5) academic years, such information was within Professor Gorman's January 14, 2022, submission.

42. On or about February 9, 2022, the Departmental, Promotion, Tenure, and Rank (PTR) Committee consisting of Pryor, Collins, Durington, Manasse,

Elliott, and Clifford, all voted unanimously (6-0) that Professor Gorman's comprehensive review was unsatisfactory.

43. On or about Feb. 10, 2022, Professor Gorman had a Zoom meeting with Collins and Durington regarding the negative review. Professor Gorman expressed his concern that the review was not accurate, retaliatory, and that they were trying to terminate him over his prior whistleblowing activity.

44. On or about March 4, 2022, Chulos carbon copied Professor Gorman to a letter Chulos sent to Provost Melanie Perrault (Provost Perrault). The letter provided a broad affirmation of the Department's vague and highly subjective evaluation that disregarded outstanding peer teaching evaluations, an abundance of student praise, a record of extraordinary student mentorship, a documented, imminent book publication, and examples of more than adequate levels of service.  Instead, Chulos alleged that the "portfolio was confusing in its location and use," and claimed "lack of documentation in the research and service sector," "problems with the syllabus and content of a course taught in 2020 – 2021 that did not align with the catalogue description," and no demonstration of publishing and/or presenting scholarly work, and included misrepresentation of the word "laboratory" in relation to service done.

45. Chulos failed to be specific, per the ART Policy, about the alleged deficiencies.

46. The ART Policy outlines the evaluation categories for the comprehensive review: "(1) teaching effectiveness, including student advising; (2) research,

10

scholarship, and in appropriate areas, creative activities; and (3) service to the community, profession, and University (including department, college, and University levels)."

47. The ART Policy states that "[s]tudent evaluations of instruction are a required part of the evaluation faculty. Such an evaluation must be recognized for what it is: one kind of evaluation, and to be considered only in concert with all other measures of teaching effectiveness. "Additionally, the Provost published an interpretative guidance of this rule, stating that the student evaluations shall not be deemed determinative in personnel matters."

48. The ART Policy further states that "[i]n the event that a faculty member has consistent unsatisfactory student or peer evaluations of instruction, the department chair shall develop a remediation plan in consultation with the faculty member. This plan may include mentoring, additional classroom visitations, and/or instruction in teaching effectiveness. A plan shall be put in place regardless of the rank and/or tenure status of the faculty."

49. Defendant at no point throughout Professor Gorman's tenure created a remediation plan in consultation with Professor Gorman.

50. In the ART Policy the scholarship criteria requires faculty to be "guided by the definitions of scholarship noted above and further articulated by their department and college on the basis of disciplinary/interdisciplinary intellectual interests."

51. In Chulos' letter to Perreault, Chulos articulated that one way that Professor Gorman's Comprehensive Review was allegedly unsatisfactory was due to his lack of publication, which is not even a requirement, and factually untrue as Professor Gorman is in fact published, and in the process of being published during that period of time which is allowed under the ART Policy.

52. The ART Policy's service criteria is that under the *American Association of University Professors Statement on Shared Governance* and "substantive participation in the shared governance activities of the department, college and University;" "participation in the larger community… outside the University in ways that may not be directly related to one's academic expertise, but in ways which advance the University's mission;" "activities in professional organizations or participating in other venues external to the University… in which one's expertise is applied which advances the University's mission."

53. Professor Gorman's service met the requirements under the ART Policy.

54. The ART Policy states "[i]n the event of a negative annual review, third year review or meet recommendations by both the PTRM committees and the chair or dean the evaluation portfolio will not be forwarded to the next level of review unless the faculty member proceeds with an appeal. If no appeal is filed, the evaluation portfolio will be retained in the office of the dean."

55. Chulos not only failed to make an initial review of the department's Merit recommendation to assure fair process, as per Dean's the ART Policy

deadline in February, Chulos framed Professor Gorman's attempt at arguing against the negative annual review as something he should not do and disregarded Professor Gorman's attempt to get Chulos to fulfill his supervisory obligations.

56. The ART Policy states "[i]n the event that a faculty member wishes to challenge any written administrator evaluation and/or committee recommendation, s/he may add to the file any statement, evidence, or other documentation s/he believes would present a more valid perspective of his/her performance."

57. The ART Policy further states "[a]ll material placed in the file, including challenge materials, shall become a part of the cumulative expansion of the evaluation portfolio and shall not be removed by subsequent levels of evaluators, provided the material inclusion process has been adhered to with respect to notifying the faculty member and adhering to the review process timeline as stipulated in the Towson University Annual Review, Reappointment, Third-Year Review, Merit, Promotion, Tenure, and Comprehensive Review Calendar."

58. The ART Policy lists the terminology used in evaluation of faculty performance as: "not meritorious: performance fails to adequately to meet standards; [s]atisfactory (base merit): performance is competent and contributes to fulfilling the mission of the University, college, and department; [e]xcellent (base merit pulse on performance merit): excellence

in teaching, or scholarship, or service and satisfactory performance in other performance categories."

59. On or about Mar. 10, 2022, Professor Gorman made a whistleblower complaint to Schatzel, Perreault, Jones, and University Counsel regarding what he characterized as RICO issues and corruption in hiring, promotion and retention, as well as wage theft (denial of earned merit increase) and retaliation.

60. On or about March 18, 2022, Perreault directed Professor Gorman to develop a Professional Development Plan (PDP) by June 17, 2022, to remediate his alleged failure of the original evaluation portfolio.

61. The ART Policy states "[a]ll recommendations shall be conveyed in writing to the faculty member, inclusive of any department chairperson's statement and a record of the vote count no later than the Fourth Friday in October. Negative recommendations shall be delivered in person by the department chairperson or sent by certified mail to the faculty member's last known address."

62. The ART Policy states "[a] negative comprehensive review shall be followed by the development of a written professional development plan to remediate the faculty member's failure to meet minimum expectations as noted in the comprehensive review. This written plan shall be developed by the faculty member and approved by the chair and the dean by the third Friday in June

of the Academic Year in which the negative review occurred. The plan shall be signed by the faculty member, chair and dean."

63. On or about April 11, 2022, Professor Gorman submitted a whistleblower complaint to the Governor's Office, elevating his concerns of misconduct beyond the University.

64. On or about June 21, 2022, Perreault notified him that due to Professor Gorman's failure to provide a PDP he was "issued a sanction of suspension with pay – effective immediately – through September 30, 2022. During this period of time, you are not to come to campus, teach any courses, or advise any students."

65. The Defendant's ART Policy does not state that failure to produce a requested PDP amounts to a suspension nor a sanction, in fact the ART states: "[i]f in the judgment of the appointee's department chair or supervisor a deficiency in the appointee's professional conduct or performance exists that does not warrant a dismissal or suspension, a moderate sanction such as a formal warning or censure may be imposed, provided that the appointee is first afforded an opportunity to contest the action through the established faculty grievance procedure."

66. On or about August 31, 2022, Professor Gorman submitted a document entitled 'Professional Plan.'

67. On or about September 8, 2022, Department Chair of Sociology, Anthropology & Criminal Justice Marion R. Hughes. (Hughes) sent to Chulos and carbon

copied Professor Brian Gorman a letter formally rejecting Professor Gorman's 'Professional Plan' stating it "fails to address the issues in his comprehensive review" and lacked sufficient detail in scholarship dissemination, advising philosophy, teaching remediation plans, planned service, and identifiable measures.

68. On or about September 9, 2022 a ten (10) minute meeting was held via Zoom with Dean Chulos, Chair Hughes, and Professor Gorman, regarding Professor Gorman's PDP where Chulos notified Professor Gorman of the following: a request for Professor Gorman not to speak with any faculty or any former students; that there will be no questions, discussion, or debate during the meeting; that Professor Gorman remains banned from campus; and the suspension with pay continued until September 30, 2022. During the meeting Professor Gorman stated his belief that his comprehensive review was satisfactory and if they found that it was not, Professor Gorman asked for help in telling him how it was unsatisfactory.

69. On or about September 23, 2022 President Kim Schatzel sent a letter to Professor Gorman notifying him that his position was being terminated effective October 21, 2022 for 'willfull neglect' of duties.

70. The ART Policy states that "[t]he President may terminate the appointment of a tenured… for willful neglect of duty, provided that the charges be stated in writing, that the appointee be furnished a copy thereof, and that the appointee be given an opportunity prior to such termination to request a

hearing by impartial hearing officer appointed by the President or faculty board of review as provided by the relevant University policy body."

71. The ART Policy does not define 'willful neglect.'

72. The termination letter stated that, "if you choose not to appeal, the University will provide you with a one-time lump sum payment for compensation… beginning October 21, 2022."

73. The ART Policy states "[i]f an appointment is terminated in the manner prescribed… the President may, at his or her discretion, relieve the appointee of assigned duties immediately or allow the appointee to continue in the position for a specified period of time. The appointee's compensation shall continue for a period of one year commencing on the date on which the appointee received notice of termination."


## COUNT I:

## 42 USC §1983 VIOLATION OF PROCEDURAL DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

### Gorman v. Towson University

74. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as though fully set forth herein.

75. The Defendants were, at all relevant times, acting "under color of law," pursuant to the laws and regulations of the State of Maryland, and the Constitution of the United States. All actions were taken by employees of a State university.

76. Professor Gorman was deprived of his Constitutional rights as well as his rights as described above under the Civil Rights Act, a federal statue.

77. Professor Gorman was deprived of his Constitutional rights as it has been implicitly incorporated in Article 24 of the Maryland Declaration of Rights, state constitution.

78. With respect to the United States Constitution, Professor Gorman was denied the right to due process of law insofar as his employer, a state university, suspended him without a proper right nor access to materials to appeal, and when Defendants failed to provide him with adequate notice of specific charges against him, a meaningful opportunity to respond to the charges, an impartial decision-maker, and access to evidence and materials necessary for his defense before suspension and termination.

79. As a tenured professor, Professor Gorman possesses a constitutionally protected property interest in his employment that could not be terminated without due process of law.

80. Defendant's ART Policy outlined specific steps required for the termination of tenured professors like Professor Gorman; under this policy, Gorman was entitled to pre-termination notice of charges and an opportunity to be heard before being deprived of his property interest in employment. He received neither.

81. The Defendant explicitly stated in its termination letter, "if you choose not to appeal, the University will provide you with a one-time lump sum payment

for compensation… due for the one (1) year period beginning October 21, 2022 and ending October 20, 2023, in accordance with ART Policy."

82. The ART Policy states that after termination of a tenured professor, "compensation shall continue for a period of one year commencing on the date on which the appointee receives notice of termination." The policy does *not* condition post-tenure compensation on the employee declining to appeal their termination, as Towson did in its termination of Professor Gorman.

83. The Defendant 's misrepresentation of Professor Gorman's right to appeal and relationship to severance payments in its termination letter was prejudicial as it incorrectly informed Professor Gorman of his potential due process rights under the ART policy and actively limited Professor Gorman's access to a review hearing.

84. Defendant's termination of Gorman intentionally departed from its standard tenure policy to divest Gorman of either the severance compensation due to him under the ART Policy or of his right to appeal his termination It premised his ability to appeal the termination on non-acceptance of  to a review hearing and appeal process on declining a full year of severance payment that

85. Further, the Defendant significantly limited Professor Gorman's ability to gather information in support of an appeal by barring him from campus and campus systems in its termination letter. The Defendant explicitly stated in its suspension letter, that Professor Gorman is "not to come to campus."

86. Professor Gorman's banishment from a public place is deprivation of his liberty, and such banishment took place prior to a hearing of his removal of his right to liberty.

87. Professor Gorman's termination letter only offered him a potential opportunity for a hearing solely in exchange for relinquishing the one-year of severance guaranteed under the Defendant's own ART Policy, effectively removing the due process rights he had under the ART Policy and the law.

88. Professor Gorman as a tenured professor is entitled, under Due Process, to an opportunity or a hearing to present his side of the story which was denied to him by the Defendant.

## <u>COUNT II:</u>

## CIVIL CONSPIRACY UNDER 42 USC § 1985

## Gorman v. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse, Elliott, and Collins

1. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

2. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse, Elliott, and Collins had an agreement and a meeting of the minds to engage in a manner to deprive Professor Gorman of his constitutional rights by retaliating against him for his protected speech and deny him due process in employment proceedings.

3. Pryor, Clifford, Durington, Manasse, Elliott, and Collins's conspiracy was motivated as an act against Professor Gorman, as a person who exposed

departmental corruption, they were a part of, after he blew the whistle on

Clifford, Durington, Manasse, Elliott, and Collins's self-dealing while on the

2021 Criminal Justice Search Committee for position CLA-3407.

4. Barker, Chulos, Hughes, Schatzel, and Perrault's cooperation in the
   conspiracy is due to them deciding to look the other way when the self-
   dealing was brought to their attention, in addition to their willful acts of
   dissuading whistle blowing.

5. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington,
   Manasse, Elliott, and Collins's conspiracy aimed to deprive Professor Gorman
   of his property interest in his employment under relevant federal holdings
   and equal treatment.

6. Professor Gorman suffered the loss of use of his degree through the
   suspension with pay, damage to his professional reputation, denial of merit
   pay increases, and physical and electronic banishment from campus.

7. Pryor, Clifford, Durington, Manasse, Elliott, and Collins overtly acted in
   furtherance of their conspiracy by manipulating the comprehensive 5- year
   comprehensive review process with predetermined negative outcomes.

8. Barker, Chulos, Hughes, Schatzel, and Perreault, overtly acted in
   furtherance of their conspiracy by purposefully not abiding by the ART Policy
   to  suspend and terminate Professor Gorman.


**COUNT VI CIVIL CONSPIRACY UNDER 42 USC § 1983**

## Gorman v. All Defendants

9. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as though fully set forth herein.

10. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse, Elliott, and Collins had an agreement and a meeting of the minds to engage in a manner to deprive Professor Gorman of his constitutional rights by retaliating against him for his protected speech and deny him equal protection in employment proceedings.

11. Pryor, Clifford, Durington, Manasse, Elliott, and Collins's conspiracy was motivated as an act against Professor Gorman, as a person who exposed departmental corruption, they were a part of, after he blew the whistle on Clifford, Durington, Manasse, Elliott, and Collins's self-dealing while on the 2021 Criminal Justice Search Committee for position CLA-3407.

12. Barker, Chulos, Hughes, Schatzel, and Perreault's cooperation in the conspiracy is due to them deciding to look the other way when the self-dealing was brought to their attention, in addition to their willful acts of dissuading whistle blowing.

13. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse, Elliott, and Collins's conspiracy aimed to deprive Professor Gorman of his property interest in his employment under relevant federal holdings and equal treatment.

14. The conspiracy entered into by these defendants was designed to achieve the goal of terminating Professor Gorman as a professor at Towson University, since he exposed departmental corruption and challenged improper conduct.

15. These defendants acted jointly by disregarding Professor Gorman's whistle blowing allegations against Pryor, Clifford, Durington, Manasse, Elliott, and Collins and placing Pryor, Clifford, Durington, Manasse, Elliott, and Collins as the PTR Committee members to review whether Professor Gorman was able to stay at Towson University.

16. Instead of investigating Professor Gorman's reports of self-dealing during the hiring process for the 2021 Criminal Justice Search Committee, defendants Barker, Chulos, Hughes, Schatzel, and Perreault told the Criminal Justice Search Committee to stop and ask yourself a list of questions to deter someone from making a complaint, emailing, or calling a superior.

17. Only months after Professor Gorman's notice of whistle blowing on Clifford, Durington, Manasse, Elliott, and Collins, these same individuals were appointed to be PTR Committee Members to review Professor Gorman's 5-year Comprehensive Review.

18. These defendants specifically acted when they conspired to terminate Professor Gorman from his position as a professor at Towson University without proper due process and in retaliation for his protected speech exposing departmental misconduct.

19. The defendants were able to deprive Professor Gorman of his constitutional rights to equal protection and First Amendment free speech as they were not adequately supervised, allowing them to proceed with Professor Gorman's suspension and termination without a hearing and to retaliate against his protected speech when he spoke out about improper conduct and corruption in the department.

20. The defendants conspired to not allow Professor Gorman fair treatment by rigging the comprehensive review process that was predetermined to be 'unsatisfactory' by placing the people he blew the whistle on as the sole determinants of whether Professor Gorman satisfied the requirements to remain employed at Towson University.

21. Professor Gorman suffered the loss of use of his degree through the suspension with pay, damage to his professional reputation, denial of merit pay increases, and physical and electronic banishment from campus.

22. Pryor, Clifford, Durington, Manasse, Elliott, and Collins overtly acted in furtherance of their conspiracy by manipulating the comprehensive 5-year comprehensive review process with predetermined negative outcomes.

23. Barker, Chulos, Hughes, Schatzel, and Perreault overtly acted in furtherance of their conspiracy by purposefully not abiding by the ART Policy to suspend and terminate Professor Gorman.

24. All defendants performed overt acts in furtherance of the conspiracy by manipulating the review process by placing the people Professor Gorman

spoke out about on his committee, and then by those committee members

finding Professor Gorman's 5-year Comprehensive Review 'unsatisfactory.'

25. All defendants acted under color of state law as they acted in their official

capacities as faculty members and administrators of Towson University, a

public institution.

## COUNT III:

**STATE TORT OF TERMINATION AGAINST PUBLIC POLICY**

**Gorman v. Towson University**

26. Plaintiff re-alleges and incorporates by reference the previous averments, and

the paragraphs, infra, into this count as through fully set forth herein.

27. Professor Gorman was discharged by Towson on September 23, 2022.

28. Defendants discharged Professor Gorman in violation of public policy for

exercising his legal right to make complaints against his colleagues by

raising issues of employee misconduct and potential conflicts of interest and

use of State and federal funds within a State university. See *Elliott v.*

*Maryland Correctional Training Center et al.*, 2021 WL 2155035, 4 (D. Md.

May 27, 2021).

29. Prior to Professor Gorman's whistleblowing against colleagues, his

performance was meeting Towson University's legitimate expectations, which

is how he was able to become and remain a tenured professor until 2022.

30. Towson University, through its agent Dean Chulos, instructed the department to refrain from making a complaint, email, or phone call, to supervisors when something takes place.

31. Towson University then appointed Clifford, Durington, Manasse, Elliott, and Collins to be on Professor Gorman's PTR Committee after he blew the whistle on their improper actions. Clifford, Durington, Manasse, Elliott, and Collins baselessly found Professor Gorman's 5-year Comprehensive Review 'unsatisfactory.'

32. Towson University soon after terminated Professor Gorman, the basis for the termination was that Professor Gorman's 5-year Comprehensive Review was unsatisfactory.

33. Professor Gorman's termination was wrongful and without any cause whatsoever in that it resulted from Professor Gorman's rightful decision to speak out against an unlawful activity and from the exercise of his rights and duties as an employee and citizen to notify supervisors of the unlawful activity.

34. The avowed public policy of the State of Maryland is to encourage citizens to report criminal activity and fraud.

35. Towson University's conduct in terminating Professor Gorman was deliberate, malicious, willful, and intentionally calculated to inflict harm upon Professor Gorman.

36. Towson University deliberately placed biased members on the PTR Committee, who willfully acted with malicious intent against Professor Gorman in retaliation for his whistle blowing against them, intentionally inflicting harm upon Professor Gorman, by not following the ART Policy nor the required due process steps.

## COUNT IV:

## BREACH OF CONTRACT

## Gorman v. Towson University

37. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as though fully set forth herein.

38. Defendant had a contractual employment obligation to Professor Gorman. The ART Policy defined the terms of the tenured professor contract between Defendant Towson and the Plaintiff.

39. Defendant materially breached the contract when:

   a. Defendant did not abide by the procedural requirement set forth in the contract by not reviewing the department recommendations by the first Friday in February and forwarding them to the Provost within the time required.

   b. Defendant's failure to have the required eight (8) members of the PTRM committee when reviewing Professor Gorman's comprehensive review.

   c. Defendant use of improper standard of review and terminology of 'unsatisfactory' for Professor Gorman's comprehensive plan, when the

27

contract requires the standard of review and terminology to be either "excellent, satisfactory, or not meritorious."

d.  Defendant's failure to abide by the contract by not developing a remediation plan in consultation with Professor Gorman to assist him in his consistent unsatisfactory student evaluations of instruction.

e.  Defendant's failure to abide by the contract by not having the required number of PTRM committee members when the committee held the review for Professor Gorman's comprehensive review.

f.  Defendant's failure to provide Professor Gorman with a written recommendation for his negative recommendations.

g.  Defendant's failure to abide by the contract by suspending and banning Professor Gorman from campus when the contract does not allow for such an extreme action to take place by the alleged misconduct of Professor Gorman.

h.  Defendant violated the contract by conditioning Professor Gorman's right to severance compensation on not appealing his termination, despite the contract's clear and non-conditional promise of one year of post-termination compensation.

40. Professor Gorman substantially performed his contractual obligations, as evidenced by his publication record, teaching evaluations, and service contributions.

41. Professor Gorman's professional conduct and performance did not warrant a dismissal or suspension, per the ART Policy; however, a suspension was administered, nonetheless. Furthermore, Professor Gorman was not afforded an opportunity to contest the action through established grievance procedures unless he relinquished his right to post-termination compensation under his contract/the ART Policy.

42. Defendant further breached the contract by arbitrarily terminating Professor Gorman due to an alleged willfully neglectful action; however, Defendant cannot demonstrate any deliberate act Professor Gorman took to raise to the standard of willfully neglectful.

43. As a direct result of Defendants' breach, Professor Gorman suffered damages including lost wages, benefits, and damage to his professional reputation.

## COUNT V:

## NEGLIGENT SUPERVISION

## Gorman v. Towson University

44. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

45. Towson University and Professor Gorman had an employment relationship with Professor Gorman being employed by Towson University.

46. Towson University had a duty to Professor Gorman to make sure that there is no potential bias in the PTR Committee that reviewed his 5-year Comprehensive Review.

47. Towson University, Chulos, Hughes, and Perreault breached its duty to Professor Gorman when it placed Pryor, Clifford, Durington, Manasse, Elliott, and Collins on the PTR Committee when there was a clear conflict of interest and negative bias between them and Professor Gorman.

48. Towson University further breached its duty, by allowing Barker, Chulos, Hughes, Schatzel, and Perreault to dissuade whistle blowing allows self-dealing to continue within one of its departments.

49. Towson University, Chulos, Hughes, and Perreault acted with incompetence when Towson University placed Pryor, Clifford, Durington, Manasse, Elliott, and Collins on the PTR Committee to review Professor Gorman's 5-year Comprehensive Review after Professor Gorman blew the whistle and exposed them for their part in the corruption in the department.

50. Towson University was notified of Professor Gorman's whistle blowing against Clifford, Durington, Manasse, Elliott, and Collins during the 2021 Criminal Justice Search Committee, by Professor Gorman in early 2021.

51. Clifford, Durington, Manasse, Elliott, and Collins, were made aware of Professor Gorman's whistle blowing as they were notified by Professor Gorman as well as other supervisors in the department; because  Clifford, Durington, Manasse, Elliott, and Collins had knowledge of Professor Gorman's whistle blowing it is a clear bias for them to be on his PTR Committee. Additionally, Clifford had an extreme bias against Professor

Gorman as he was the one that led to Clifford being removed from their position as chair.

52. Towson University was given actual notice of Professor Gorman's involvement with the exposure of Clifford, Durington, Manasse, Elliott, and Collins with their part in the corruption in the department.

53. Towson University was given actual notice about Barker, Chulos, Hughes, Schatzel, and Perreault's knowledge of the corruption within the department and their continuance of allowing it. Additionally, Towson University was given actual notice of Barker, Chulos, Hughes, Schatzel, and Perreault's violations of the ART Policy.

54. Towson University's act of placing Clifford, Durington, Manasse, Elliott, and Collins on the PTR Committee was a direct cause of Professor Gorman's injuries.

55. Towson University's act of allowing Barker, Chulos, Hughes, Schatzel, and Perreault to place Clifford, Durington, Manasse, Elliott, and Collins on the PTR Committee after the conversations and notice they received from Professor Gorman was a direct cause of Professor Gorman's injuries.

56. Professor Gorman suffered economic loss and damage to his professional reputation and career prospects.

57. Towson University's negligence in retaining Clifford, Durington, Manasse, Elliott, and Collins was the but for cause of Professor Gorman's termination from his position as a professor at Towson University.

58. Towson University's negligence in retaining Barker, Chulos, Hughes, Schatzel, Perreault, Clifford, Durington, Manasse, Elliott, and Collins after the notice of their corruption in the department, allowed Clifford, Durington, Manasse, Elliott, and Collins to be placed on the PTR Committee to continue their use of bias to directly lead to Professor Gorman's termination.

## COUNT VI:

### INTENTIONAL MISREPRESENTATION

### Gorman v. Pryor, Clifford, Durington, Manasse, Elliott, and Collins

59. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

60.  Pryor, Clifford, Durington, Manasse, Elliott, and Collins asserted a false representation of material fact to Professor Gorman that his 5-year Comprehensive Review was 'unsatisfactory.'

61. This statement is a material fact as it was the determinative factor for Professor Gorman's termination.

62. This statement is false as Professor Gorman met all the requirements for the 5-year Comprehensive Review and the term 'unsatisfactory' is not a level of merit that is used for review under the ART Policy, which states the level of merits are: "excellent," "satisfactory," and "not meritorious."

63. Pryor, Clifford, Durington, Manasse, Elliott, and Collins knew that the representation was false because the term 'unsatisfactory' is not a level of merit that is used for review under the ART Policy.

64. Pryor, Clifford, Durington, Manase, Elliott, and Collins as Professor Gorman's Comprehensive Review met the requirements set in the ART Policy and Pryor, Clifford, Durington, Manasse, Elliott, and Collins did not provide Professor Gorman with any changes that needed to be made.

65. Pryor, Clifford, Durington, Manasse, Elliott, and Collins made the statement with such reckless disregard for the truth because Pryor, Clifford, Durington, Manasse, Elliott, and Collins did not elaborate nor explain to Professor Gorman what allegedly made his 5-year Comprehensive Review 'unsatisfactory.' This therefore did not allow him the ability to argue or appeal the decision.

66. Pryor, Clifford, Durington, Manasse, Elliott, and Collins made the false representation of the 5-year Comprehensive Review for the purpose of defrauding Professor Gorman, to lead to him not having enough information to appeal and therefore led to his termination.

67. Professor Gorman relied on Pryor, Clifford, Durington, Manasse, Elliott, and Collins's representation and unjustly engaged in the process of preparing an ADP.

68. Professor Gorman suffered damages as a result of his reliance on Pryor, Clifford, Durington, Manasse, Elliott, and Collins's misrepresentation.

69. Professor Gorman suffered economic loss and damage to his professional reputation and career prospects.

## COUNT VII:

## NEGLIGENT MISREPRESENTATION

### Gorman v. Towson University

70. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

71. Towson University represented the matter of Professor Gorman's 'unsatisfactory' 5-year Comprehensive Review as true when it was false.

72. Professor Gorman relied on the false representation to his detriment as he believed that his 5-year Comprehensive Review was 'unsatisfactory' and proceeded through the process under that belief, leading to his termination.

73. Professor Gorman suffered harm as a result of his reliance on the misrepresentation.

74. Professor Gorman suffered economic loss and damage to his professional reputation and career prospects.

## COUNT VII:

## CONTRACTUAL INTERFERENCE

## WITH ECONOMIC RELATIONS

### Gorman v. Barker, Chulos, Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse, Elliott, and Collins

75. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

76. An employment contract existed between Towson University and Professor Gorman, with him being a tenured professor for Towson University.

77. Pryor, Clifford, Durington, Manasse Elliott, and Collins, have actual knowledge of the existence of Professor Gorman's contract with Towson University, as he had the same or similar contracts as they did with Towson University.

78. Pryor, Clifford, Durington, Manasse Elliott, and Collins intentionally conducted themselves in an improper manner by using their bias against Professor Gorman to come to the result that his 5-year Comprehensive Review was 'unsatisfactory,' which induced Towson University to breach their contract by not abiding by the ART Policy and termination of Professor Gorman.

79. Barker, Chulos, Hughes, Schatzel, and Perreault, have actual knowledge of the existence of Professor Gorman's contract with Towson University, as they were the ones to send him the contract and referenced the contract in their communications with Professor Gorman.

80. Barker, Chulos, Hughes, Schatzel, and Perreault, intentionally conducted themselves in an improper manner by purposefully misrepresenting that Professor Gorman did not meet requirements, which induced Towson University to breach their contract by not abiding by the ART Policy and termination of Professor Gorman.

81. Towson University, as the third party that was induced, subsequently breached their contract with Professor Gorman based on Barker, Chulos,

Hughes, Schatzel, Perreault, Pryor, Clifford, Durington, Manasse Elliott, and Collins's result of the 5-year Comprehensive Review.

82. Professor Gorman suffered damages as a result from the breach and non-performance of the contract.

83. Professor Gorman suffered economic loss and damage to his professional reputation and career prospects.

## COUNT VIII:

## TORT OF INTENTIONAL INTERFERENCE

## WITH ECONOMIC RELATIONS

### Gorman v. Pryor, Clifford, Durington, Manasse, Elliott, and Collins

84. Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, infra, into this count as through fully set forth herein.

85. Pryor, Clifford, Durington, Manasse, Elliott, and Collins have acted in a way showing negative bias towards Professor Gorman prior to the PTR Committee review. Pryor, Clifford, Durington, Manasse, Elliott, and Collins's negative bias permeated throughout their response to Professor Gorman's whistle blowing of their behavior during the 2021 Criminal Justice Search Committee.

86. Pryor, Clifford, Durington, Manasse, Elliott, and Collins had a motive to have Professor Gorman's terminated from Towson University as he exposed them for departmental corruption, with him terminated Pryor, Clifford, Durington, Manasse, Elliott, and Collins can continue to their improper conduct within the department.

87. Professor Gorman's conduct of whistle blowing interfered with their improper conduct within the department as well as their self-dealing endeavors during the hiring process.

88. Pryor, Clifford, Durington, Manasse, Elliott, and Collins sought to advance their improper conduct and self-dealing endeavors within the department.

89. Pryor, Clifford, Durington, Manasse, Elliott, and Collins have a social interest in protecting the freedom of their improper conduct in the department, which would be made easier if Towson University breached their contract by terminating Professor Gorman.

90. Pryor, Clifford, Durington, Manasse, Elliott, and Collins's improper conduct was being called-out by Professor Gorman which made his removal proximate to their continued improper conduct.

91. Pryor, Clifford, Durington, Manasse, Elliott, and Collins, were the only ones on the PTR Committee that reviewed Professor Gorman's 5-year Comprehensive Review, making their relationship that of a superior and subordinate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

92. Grant a judgement in favor of the Plaintiff and declare that the Defendant has violated all counts,

93. Award compensatory and punitive damages to the Plaintiff for damages incurred as a result of the defendants' misconduct against him, as alleged in this Complaint, and

94. Order that the Court award Defendant all injunctive relief the Court sees fit such as:

    a. Reinstatement of Plaintiff to his former position, with full restoration of seniority, benefits, and pay at the level he would have had he not been unlawfully terminated.

    b. Removal of Plaintiff's detrimental material from institutional files

    c. A written correction of institutional records.

    d. Any additional specific performance the Court believes would adequately make the Plaintiff whole, and

95. Award Plaintiff all reasonable Attorney's Fees and costs associated with bringing this action.

Plaintiff prays for any such additional relief as justice may require and this Court may find appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a trial by jury of all issues so triable.

Dated: September 23, 2025        Respectfully Submitted,

                    /s/ Katherine Patton
                    Katherine Patton, Fed. Bar No. 30693

                    Quinn Patton, LC

838 Ritchie Highway, Suite 4
Severna Park, Maryland 21146
(443) 247-5444
katpatton@quinnpatton.com

*Attorneys for the Plaintiff*