## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

\*

BRIAN GORMAN,                    \*

    Plaintiff,                    \*

v.                               \*        Case No. 1:25-cv-03157-SAG

TOWSON UNIVERSITY, *et al.*,     \*

                                 \*

    Defendants.                  \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

NOW COMES Plaintiff, Brian Gorman, Ph.D. ("Plaintiff" or "Dr. Gorman"), by and through his undersigned counsel, opposing Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6) as filed on February 17, 2026.

### TABLE OF CONTENTS

I.  STANDARDS OF REVIEW ............................................................................... 3

II.  THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS BECAUSE HE SEEKS PROSPECTIVE RELIEF AGAINST STATE OFFICIALS UNDER EX PARTE YOUNG ..................................................................................................................... 5

III.  DR. GORMAN'S SPEECH ABOUT CORRUPTION AND SELF-DEALING WAS MADE AS A CITIZEN ON A MATTER OF PUBLIC CONCERN, NOT PURSUANT TO HIS OFFICIAL DUTIES ...................................................................................................... 8

IV.  DR. GORMAN WAS DENIED CONSTITUTIONALLY REQUIRED PRE-TERMINATION PROCESS ........................................................................................... 12

V.  PLAINTIFF HAS ADEQUATELY ALLEGED CIVIL CONSPIRACY AND EQUAL PROTECTION VIOLATIONS, AND INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ........................................................................................ 16

VI.  ALL OF PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY BEFORE THIS COURT AND STATE VIABLE CAUSES OF ACTION ........................................................ 19

VII.  IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND .................. 24

1

Professor Brian Gorman spent sixteen years building a career at Towson University, earning tenure in 2012. Compl. ¶18. When he witnessed colleagues engage in self-dealing and undisclosed conflicts of interest in a faculty hiring process, he reported it — to the Dean, to University General Counsel, to the Governor's Office, and through EthicsPoint. Compl. ¶¶18, 25, 26, 43, 63. He was told, explicitly, not to. Compl. ¶¶23-24.

What followed was a coordinated campaign to remove him. The same faculty members he had accused of misconduct were appointed to evaluate his five-year comprehensive review. Compl. ¶¶32, 111, 123. He was then suspended and banned from campus — physically and electronically — during the very period he was expected to prepare a Professional Development Plan in response to that evaluation. Compl. ¶52. When the time came for a pre-termination hearing, it was a ten-minute Zoom call in which Dean Chulos opened by announcing there would be "no questions, discussion, or debate." Compl. ¶56. Dr. Gorman was terminated for "willful neglect of duties," a four-word charge identifying no specific conduct, no timeframe, and no particular duty neglected. Compl. ¶57. President Schatzel's termination letter then conditioned Dr. Gorman's guaranteed one-year severance — compensation the ART Policy provides unconditionally to all terminated tenured faculty — on his decision not to appeal. Compl. ¶¶60, 73.

Defendants now move to dismiss every claim arising from this conduct. Their motion should be denied. Plaintiff seeks prospective equitable relief (reinstatement) which falls squarely within *Ex Parte Young* under binding Fourth Circuit authority. His whistleblowing was citizen speech on a matter of public concern (corruption, self-dealing, and undisclosed conflicts of interest in faculty hiring at a public university funded by Maryland taxpayers) — not speech related to his duties as a criminal law professor under *Garcetti*. He was denied the constitutional minimum *Loudermill* requires.

Further, all of his state law claims are properly before this Court, and Plaintiff has contemporaneously filed a Motion for Declaration of Good Cause pursuant to Md. Code, State Gov't § 12-106(c), incorporated herein by reference, establishing on two independent grounds that the MTCA's written-notice requirement does not bar his State tort claims. For the reasons set forth below, Plaintiff respectfully requests this Court deny Defendants' Motion to Dismiss in its entirety.

## I.    <u>STANDARDS OF REVIEW</u>

### A.  <u>Fed. R. Civ. P. 12(b)(1)</u>

When a defendant challenges subject matter jurisdiction facially, the Court accepts the allegations in the complaint as true and determines whether they are sufficient to invoke the Court's jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Dismissal under Rule 12(b)(1) is appropriate only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Where the jurisdictional question is intertwined with the merits of a plaintiff's federal claims, the Court should ordinarily assume jurisdiction and proceed to the merits. *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999). Defendants challenge jurisdiction facially under the Eleventh Amendment, arguing that *Ex Parte Young* does not apply. The Court must therefore accept as true Plaintiff's allegations that Defendants continue to deny him his tenured position in violation of federal law.

### B.  <u>Fed. R. Civ. P. 12(b)(6)</u>

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024). The question is whether the complaint contains sufficient factual matter to state a claim

plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "So long as a complaint contains factual allegations that raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible, dismissal is improper." *Barbour*, 105 F.4th at 589. Plaintiff need not establish his case at this stage; he need only allege facts that, if proven, would support relief. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Defendants compound their legal error by importing Rule 56 standards into a 12(b)(6) motion. These are fact-intensive questions that have no place here, prior to discovery. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) addressed "the order and allocation of proof" at summary judgment — a framework for organizing evidence, not a gate through which a complaint must pass. *Twombly*, 550 U.S. at 569-70. The Supreme Court made this explicit in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002): "The prima facie case under *McDonnell Douglas* is an evidentiary standard, not a pleading requirement." The precise requirements of a prima facie case "were never intended to be rigid, mechanized, or ritualistic," *id.* at 512 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)), and requiring a plaintiff to plead one at the motion to dismiss stage contradicts Rule 8(a)'s requirement of only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 513. It is "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits." *Id.* at 510.

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Applying this standard, Plaintiff has pled sufficient factual matter to state claims that are plausible on their face.

4

## II.   THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS BECAUSE HE SEEKS PROSPECTIVE RELIEF AGAINST STATE OFFICIALS UNDER EX PARTE YOUNG

Defendants argue that Towson University is a state instrumentality entitled to Eleventh Amendment immunity from retrospective monetary relief. See Def. Mem. at 8-9. That immunity does not, however, bar this action. *Ex Parte Young*, 209 U.S. 123 (1908), permits suits against state officials in their official capacities to obtain prospective relief remedying ongoing violations of federal law. Dr. Gorman seeks exactly that: reinstatement to his tenured faculty position, removal of defamatory material from his institutional records, and an injunction against ongoing constitutional violations — all sought against the individual Defendants in their official capacities. Compl. at 38 ¶182(a)-(d). The Eleventh Amendment does not stand in the way of those claims.

### A.  The Ex Parte Young Framework

The Supreme Court has clarified that courts must conduct "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" to determine whether *Ex Parte Young* avoids an Eleventh Amendment bar. *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 298-99). The inquiry focuses on two elements: (1) whether the complaint alleges an ongoing violation of federal law, and (2) whether the relief sought is prospective in nature. *Id.* at 645.

Dr. Gorman's Complaint satisfies both prongs. First, he alleges that the individual Defendants — acting in their official capacities — continue to deprive him of his constitutionally protected property interest in his tenured faculty position in violation of the Fourteenth Amendment's Due Process Clause. Compl. ¶¶51-66. Second, he seeks reinstatement to his former

position with full restoration of seniority, benefits, and pay, along with removal of defamatory material from institutional records and prospective injunctive relief. Compl. at 38 ¶182(a)-(d). These allegations bring this case squarely within *Ex Parte Young*.

**B. The Individual Defendants Have the Requisite Authority Over the Ongoing Deprivation**

*Ex Parte Young* operates by permitting suit against the state officials responsible for the ongoing constitutional violation — not against the state entity directly. The individual Defendants here are not peripheral to Dr. Gorman's claims. To the extent Defendants invoke *McBurney v. Cuccinelli,* 616 F.3d 393, 399 (4th Cir. 2010), which requires a special relation between the named state official and the challenged action, Dr. Gorman satisfies any such requirement. President Schatzel issued the termination letter. Provost Perreault directed the professional development plan process and imposed the campus ban. Dean Chulos endorsed the negative evaluation and presided over the sham meeting. Compl. ¶¶34-35, 49, 57. Each has direct authority over personnel decisions and enforcement of the ART Policy governing Dr. Gorman's tenure rights, and each is personally responsible for the ongoing denial of his position. See also *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

**C. Reinstatement Constitutes Prospective Relief Under Controlling Fourth Circuit Authority**

The Fourth Circuit has explicitly held that "every circuit, including this one, has held that claims for reinstatement to previous employment meet the *Ex Parte Young* exception." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020). The court explained that when a plaintiff "contends that [the defendant's] refusal to reinstate him to his prior position is an ongoing violation of federal law," the district court errs in characterizing the dispute as retrospective. *Id.* Dr.

Gorman's circumstance reflects precisely such an ongoing violation — the individual Defendants continue to deny him his constitutionally protected property interest in tenured employment each day they refuse to reinstate him. Compl. ¶¶18, 57, 60-66. His termination became effective October 21, 2022, and he continues to be denied his position, his salary, his seniority, and his professional standing. Compl. at 38 ¶182(a). This ongoing deprivation is what makes reinstatement prospective rather than retrospective.

The prospective nature of this relief is particularly clear because Dr. Gorman held tenure — an "indefinite appointment" with a constitutionally protected property interest. Compl. ¶¶18-19; *see also Bd. of Regents v. Roth*, 408 U.S. 564, 576-78 (1972). He does not seek retrospective compensatory or punitive damages from Towson University as a state entity. While he seeks such damages from the individual Defendants in their individual capacities — claims not barred by the Eleventh Amendment — his claims against the University itself seek only prospective equitable relief. Compl. ¶¶180-183. This is precisely the type of relief *Ex Parte Young* exists to permit.

### D. <u>Defendants' Arguments That the Claims Are Retrospective Fail</u>

Defendants argue that Dr. Gorman's claims are barred because they seek retrospective relief for a "completed act" of termination. Def. Mem. at 9. This characterization misconstrues both the nature of the injury and the relief sought. The termination may have occurred on a specific date, but the constitutional violation is ongoing: Dr. Gorman continues to be wrongfully deprived of his tenured position each day that the individual Defendants refuse to reinstate him. The continuing nature of this deprivation is what makes reinstatement prospective relief.

Defendants' reliance on *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1215 (10th Cir. 2019) is misplaced. Def. Mem. at 9. In *Williams*, the Tenth Circuit declined to apply *Ex Parte Young* because the plaintiff had no non-monetary, injunctive relief sought against any parties

7

remaining in the case. *Id.* Unlike the plaintiff in *Williams*, Dr. Gorman explicitly seeks forward-looking relief: reinstatement going forward, restoration of seniority and benefits that will continue into the future, removal of defamatory materials that continue to harm his professional reputation, and an injunction preventing future violations. Compl. at 38 ¶182(a)-(d). Defendants' own reliance on *Biggs* is self-defeating: that case held that "every circuit" — including the Fourth — recognizes that reinstatement claims satisfy *Ex Parte Young*. *Biggs*, 953 F.3d at 243. The *Biggs* court's reference to *Sonletiner v. York*, 304 F.3d 704, 718 (7th Cir. 2002) merely acknowledged that reinstatement requests must be paired with allegations of a continuing violation — a requirement Dr. Gorman easily satisfies. Compl. ¶¶51-66, 182(a)-(d).

### III.  DR. GORMAN'S SPEECH ABOUT CORRUPTION AND SELF-DEALING WAS MADE AS A CITIZEN ON A MATTER OF PUBLIC CONCERN, NOT PURSUANT TO HIS OFFICIAL DUTIES

Defendants contend that the Plaintiff's whistleblowing complaints about self-dealing, conflicts of interest, and departmental corruption were made "pursuant to his official duties" under *Garcetti*, 547 U.S. at 421, and therefore not protected by the First Amendment. Def. Mem. at 16-17. This argument fails because Dr. Gorman was employed to teach criminal law courses, not to conduct internal investigations of faculty misconduct, and he was explicitly instructed not to make such complaints.

#### A. Garcetti Does Not Apply Where Speech Falls Outside the Employee's Actual Duties

Under *Garcetti*, speech loses First Amendment protection only when it is itself made pursuant to the employee's official duties. 547 U.S. at 421. The Supreme Court noted explicitly that it was not resolving whether that framework applies to the *content* of "scholarship or teaching" at public universities. *Id.* at 425. The Fourth Circuit has honored that reservation, applying a "more

nuanced" analysis for public college professors that distinguishes between "speaking as an employee" about "complaints over internal office affairs" (unprotected) and speaking as a citizen on matters of public concern (protected). *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582, 584 (4th Cir. 2023). The "critical inquiry" is whether the speech is itself ordinarily within the *scope* of the employee's duties. *Id.* (citing *Lane v. Franks*, 573 U.S. at 240).

Plaintiff was hired as an Associate Professor to teach criminal law and criminal justice courses. Compl. ¶16. His job duties did not include monitoring conflicts of interest, investigating misconduct by colleagues, or reporting ethical violations in hiring processes. The complaints at issue involved: (1) a January 2021 memo to Dean Chulos reporting self-dealing and conflicts of interest in the CLA-3407 Criminal Justice Search Committee, specifically involving Professors Manasse, Clifford, and Elliott (Compl. ¶¶18, 38-39); (2) an April 2021 memo to General Counsel reporting that Professor Antunes had a partnership relationship with the selected job candidate, constituting undisclosed self-dealing (Compl. ¶¶25, 43); (3) a February 2021 whistleblowing email to senior faculty about a pattern of bullying and corruption (Compl. ¶22); and (4) a May 2021 EthicsPoint complaint about Dean Chulos's intimidation and threatened prior restraint on speech (Compl. ¶26).

Plaintiff was explicitly told not to make such complaints. Dean Chulos instructed him that "rather than sending an email to department colleagues please bring your concerns to me, the dean, or the Office of Human Resources directly." Compl. ¶23. Dean Chulos also presented a "Statement of Problem and the Dean's Expectations" warning faculty "about speaking out about any wrongdoings happening in the committee." Compl. ¶24. These directives confirm that reporting departmental misconduct was not part of Dr. Gorman's duties — if it were, neither instruction would make sense. This alone compels the conclusion that his speech was not duty-pursuant.

B. *Lane v. Franks* **Controls: The Subject Matter of Speech Does Not Equal Official**
   **Duty**

The Supreme Court in *Lane v. Franks*, 573 U.S. 228, 240 (2014), held that "the mere fact
that a citizen's speech concerns information acquired by virtue of his public employment does not
transform that speech into employee—rather than citizen—speech." The critical question is
whether the speech is itself ordinarily within the scope of the employee's duties, not whether it
relates to the subject matter of his work. *Id.* at 238-40. Dr. Gorman did not speak because his job
required it; he spoke because he witnessed institutional corruption. That his expertise in criminal
law may have informed his understanding of the misconduct does not convert citizen
whistleblowing into official-duty speech. To the extent Defendants rely on *Henderson v. City of
Flint*, 751 F. App'x 618, 623 (6th Cir. 2018) — an unpublished Sixth Circuit decision with no
binding force in this Circuit — for the proposition that there is no First Amendment protection
where there is a professional duty to report unlawful conduct, that case is inapplicable. *Henderson*
involved a police officer with an explicit statutory reporting duty. *Lane v. Franks*, the controlling
authority, forecloses the argument that speech merely related to one's field of employment falls
outside First Amendment protection.

C. **Plaintiff's Speech Addressed a Matter of Public Concern, Not Internal Office**
   **Affairs**

The first prong of the *McVey* test asks whether the employee "was speaking as a citizen
upon a matter of public concern or as an employee about a matter of personal interest." *McVey v.
Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). That inquiry divides into two questions: whether the
speech was made as a citizen or pursuant to the employee's duties — addressed above — and

10

whether the content addressed "a matter of interest to the community" rather than "complaints over internal office affairs." *Connick v. Myers*, 461 U.S. 138, 149 (1983); *Crouse*, 848 F.3d at 583.

Plaintiff's complaints plainly satisfy the content prong. His disclosures concerned undisclosed conflicts of interest, self-dealing, and coordinated corruption in faculty hiring at a public university funded by Maryland taxpayers — not personal workplace grievances. The *Crouse* concurrence recognized that "[f]irst Amendment protections for public employees promote transparency and accountability by allowing employees to speak out about misconduct and abuses the public might otherwise never uncover." 848 F.3d at 589 (Motz, J., concurring) (citing *Lane v. Franks*, 573 U.S. 228, 235-36 (2014)). That is precisely what Dr. Gorman did.

### D.  The *Pickering* Balance Favors Dr. Gorman

If the speech was made as a citizen on a matter of public concern, the second prong of *McVey*-created test "requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." *Pickering*, 391 U.S. at 568; *Crouse*, 848 F.3d at 583. That inquiry "must take into account the context of the employee's speech . . . and the extent to which it disrupts the operation and mission of the agency." *McVey*, 157 F.3d at 278.

Defendants cannot identify any disruption to Towson's operations arising from Dr. Gorman's complaints. His memos to the Dean, to General Counsel, and to the Governor's Office did not interfere with teaching, research, or university services — they reported ethics violations through the appropriate channels.

Further, as the Supreme Court recognized, "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions" on educational matters — and "it is essential that they be able to speak out freely on such questions without fear of retaliatory

dismissal." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 572 (1968). Exposing conflicts of interest, undisclosed relationships between search committee members and job candidates, and coordinated efforts to circumvent merit-based hiring serves a vital public interest in the integrity of Maryland's public university system. Defendants have offered no interest in institutional efficiency that could plausibly outweigh that public concern. For all of these reasons, Dr. Gorman's whistleblowing was protected speech as a citizen on matters of public concern, and Defendants' motion to dismiss his First Amendment retaliation claim should be denied.

## IV.    DR. GORMAN WAS DENIED CONSTITUTIONALLY REQUIRED PRE-TERMINATION PROCESS

Defendants argue that Dr. Gorman received adequate pre-termination process under *Loudermill*. Def. Mem. at 15-16. This argument fails because the procedural deficiencies here — a ten-minute sham Zoom meeting in which no questions, discussion, or debate were permitted; denial of access to evidence and campus resources; a vague charge of neglect of duty; and coercion to waive appeal rights through conditioning of guaranteed compensation — fall far below the constitutional minimum.

### A.  Dr. Gorman Had a Clear Property Interest in Continued Tenured Employment

Dr. Gorman was appointed as an Assistant Professor at Towson University in August 2006 and was promoted to tenured Associate Professor in 2012. Compl. ¶¶16, 18. The ART Policy governing his employment defines tenure as "an indefinite appointment granted by the President that shall be terminated only due to misconduct or under other extraordinary causes." Compl. ¶19. Tenure creates a constitutionally protected property interest sufficient to invoke due process protections. *Bd. of Regents v. Roth*, 408 U.S. 564, 576-78 (1972); *Perry v. Sindermann*, 408 U.S.

12

593, 601–02 (1972); *Christian v. Cecil County, Md.*, 817 F. Supp. 1279, 1284 (D. Md. 1993). Defendants do not dispute that the Plaintiff held a property interest in his tenured position; the only question is whether the process he received satisfied constitutional minimums.

### B. The Mathews Factors and Loudermill Requirements

The Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), established a three-part balancing test: (1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used and the probable value of additional safeguards; and (3) the government's interest. All three factors weigh decisively in Plaintiff's favor. His private interest in a tenured professorship earned over sixteen years is profound. The risk of erroneous deprivation was acute: his evaluators were the very individuals he had reported for misconduct, creating structural bias that maximized the likelihood of a wrongful outcome. And Towson University's interest in avoiding a genuine hearing was minimal compared to Dr. Gorman's interest in his livelihood and career.

The Supreme Court has also established that "the root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Loudermill*, 470 U.S. at 542. The constitutionally required pre-termination process includes three elements: (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity to present his side of the story. *Id.* at 546. While this hearing "need not be elaborate," it must be meaningful — the employee must have a genuine opportunity to respond before the termination decision is made. *Id.* at 545-546.

### C. The September 9, 2022 Meeting Was Not a Meaningful Opportunity to Respond

The ten-minute Zoom meeting held on September 9, 2022 was a sham proceeding that denied the Plaintiff any meaningful opportunity to respond to the charges against him. Dean

Chulos opened the meeting by explicitly stating "there will be no questions, discussion, or debate during this meeting." Compl. ¶56. Dr. Gorman was instructed not to speak with any faculty or former students, was told he remained banned from campus, and was informed the suspension would continue through September 30, 2022. *Id.* Dean Chulos proceeded to read prepared comments "in a brisk manner," and when Dr. Gorman attempted to ask questions, he was told the meeting would not allow any collaborative process or constructive feedback. *Id.* When Dr. Gorman requested Dean Chulos slow down so the meeting could "make any sense," he was told this was "not a meeting" but merely a procedure to "tick a box for the ART Document." *Id.* Dean Chulos then announced that he and Chair Hughes would submit independent recommendations to the Provost, making clear the termination decision was already underway. Compl. ¶56. This proceeding violated every element of *Loudermill*: Dr. Gorman received no explanation of the evidence, was expressly prohibited from presenting his side of the story, and had no documents provided in advance. 470 U.S. at 546.

D. **Dr. Gorman Was Denied Access to Evidence and Campus Resources**

The due process violation was compounded by Towson University's decision to physically and electronically ban Dr. Gorman from campus during the entire period he was expected to develop his PDP and respond to allegations. On June 21, 2022, Provost Perreault suspended Dr. Gorman with pay through September 30, 2022 and explicitly prohibited him from coming to campus, teaching courses, or advising students. Compl. ¶52. This banishment denied him access to the library resources, departmental colleagues, and university computer systems necessary to prepare an adequate defense. Compl. ¶57. The Chair's September 8, 2022 letter rejecting the PDP was not provided to Dr. Gorman in advance of the September 9 meeting — he learned of the specific deficiencies only when the rejection letter was sent. Compl. ¶55. He was given no

14

opportunity to review witness statements, evidence, or the evaluation materials underlying the negative comprehensive review.

**E.  The Termination Letter Provided Vague Charges and Impermissibly Conditioned Compensation on Waiver of Appeal Rights**

President Schatzel's September 23, 2022 letter terminated Dr. Gorman for "willful neglect of duties." Compl. ¶57. This four-word charge identified no specific duty neglected, no timeframe, and no conduct. Due process requires notice "specific enough to permit [the employee] to prepare and present a meaningful response." *Henson v. Honor Comm. of the Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983). A bare conclusory charge of "willful neglect of duties" does not satisfy that standard.

Critically, the letter conditioned Dr. Gorman's receipt of one full year of severance compensation — compensation that the ART Policy guarantees unconditionally to terminated tenured faculty—on his decision not to appeal: "if you choose not to appeal, the University will provide you with a one-time lump sum payment for compensation . . . beginning October 21, 2022." Compl. ¶60. The ART Policy provides without qualification that compensation "shall continue for a period of one year commencing on the date on which the appointee received notice of termination." Compl. ¶73. The Policy imposes no condition on that payment. Towson imposed one of its own. By conditioning the one-year severance on waiver of the right to appeal, President Schatzel effectively forced Dr. Gorman to choose between his livelihood and his constitutional rights. The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Conditioning what was a standard right of tenured employees to receive severance upon termination under the

ART Policy upon forfeiture of the right to a hearing is precisely the kind of impermissible condition that *Loudermill* and *Perry* forbid.

### F. The PTR Committee's Conflict of Interest Violated Fundamental Fairness

The procedural deficiencies were further aggravated by the fact that the same faculty members who were subjects of Dr. Gorman's whistleblowing complaints — Professors Pryor, Clifford, Durington, Manasse, Elliott, and Collins — were appointed to serve on the PTR Committee that evaluated his comprehensive review. Compl. ¶¶18, 22, 25, 32, 38-39, 43. "Only months after Professor Gorman's notice of whistle blowing," Towson University appointed these same individuals to decide whether he should remain employed. Compl. ¶123. This structural conflict violated fundamental fairness. Even where post-termination remedies are available, due process requires that those remedies remain genuinely available and not be coercively foreclosed. See *Loudermill* at 546–48 (1985); *Fields v. Durham*, 909 F.2d 94, 97–98 (4th Cir. 1990). Here, the combination of a biased evaluation committee and the coercive conditioning of compensation that effectively eliminated the appeal right rendered the entire process fundamentally unfair. For all of these reasons, Defendants' motion to dismiss Count I should be denied.

## V. PLAINTIFF HAS ADEQUATELY ALLEGED CIVIL CONSPIRACY AND EQUAL PROTECTION VIOLATIONS, AND INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

### A. Section 1985 Conspiracy

Plaintiff preserves his claim under 42 U.S.C. § 1985(3). To establish a claim under § 1985(3), a plaintiff must prove a conspiracy of two or more persons motivated by a specific class-based, invidiously discriminatory animus to deprive the plaintiff of the equal enjoyment of his rights. *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995); *Griffin v. Breckenridge*, 403 U.S. 88,

16

102 (1971). Defendants contend that Dr. Gorman has failed to plead the requisite class-based animus. Def. Mem. at 18-19. Dr. Gorman has alleged that the conspiracy was motivated by animus against him for exercising his First Amendment right to expose corruption and self-dealing, which courts have recognized can satisfy § 1985's "otherwise class-based" requirement. Compl. ¶¶112-113. At minimum, whether his allegations of animus based on whistleblowing activity satisfy *Griffin's* requirement presents a factual question that should be resolved after discovery, not on a motion to dismiss.

### B. <u>Section 1983 Conspiracy</u>

A conspiracy claim under § 1983 requires showing a conspiracy to deprive the plaintiff of constitutional rights, an overt act in furtherance, and resulting injury. *Christian*, 817 F. Supp. at 1287. Dr. Gorman alleges that all Defendants "acted jointly" by placing the specific faculty members he had reported for misconduct — Professors Pryor, Clifford, Durington, Manasse, Elliott, and Collins — onto the PTR Committee to review his employment, "only months after Professor Gorman's notice of whistle blowing." Compl. ¶¶111, 119, 123. The overt acts in furtherance of this conspiracy include: the Committee's unanimous vote that his review was "unsatisfactory" (Compl. ¶32); Dean Chulos's endorsement of the negative evaluation (Compl. ¶¶34-35); Provost Perreault's suspension and campus ban (Compl. ¶52); the rejection of his PDP without meaningful review (Compl. ¶¶54-56); and President Schatzel's termination decision (Compl. ¶57). These sequential, coordinated actions by multiple defendants working in concert to deprive Dr. Gorman of his property interest in tenured employment state a plausible § 1983 conspiracy claim.

### C. <u>Equal Protection</u>

17

To state an Equal Protection claim, Dr. Gorman must demonstrate that he was treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. *Christian*, 817 F. Supp. at 1284. Dr. Gorman alleges that he "was treated differently than his similarly-situated non-whistle blower counterparts, based solely on his whistle blowing," was denied merit pay increases while comparable faculty were not, and "was the only professor that had a biased PTR Committee and therefore was the only Professor to be terminated in the 2022 cycle due to his whistle blowing." Compl. ¶¶53, 55, 82-83, 87. Professor Manasse's explicit statement that "anyone who goes against the department will never see a pay increase for the rest of their life" (Compl. ¶27) directly evidences the discriminatory intent underlying this differential treatment. These allegations state a plausible Equal Protection claim, and whether they ultimately establish that Dr. Gorman was treated differently from similarly situated colleagues is a factual question inappropriate for resolution on a Rule 12(b)(6) motion.

## D. **Individual Defendants Are Not Entitled to Qualified Immunity**

"Defendants are entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023)(quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The rights at issue here were all clearly established well before 2022. Public employees' First Amendment right to speak as citizens on matters of public concern has been clearly established since *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). The right of tenured public employees to a meaningful pre-termination hearing was clearly established in *Loudermill*, 470 U.S. 532 (1985). The prohibition on unconstitutional conditions has been clearly established since *Perry v. Sindermann*, 408 U.S. 593 (1972). A reasonable official in the individual

18

Defendants' positions would have known that retaliating against a tenured professor for whistleblowing, denying him a meaningful pre-termination hearing, and conditioning guaranteed compensation on waiver of appeal rights violated clearly established law. Moreover, qualified immunity is a fact-intensive inquiry inappropriate for resolution on a 12(b)(6) motion. *Christian*, 817 F. Supp. at 1288-89.

## VI.   ALL OF PLAINTIFF'S STATE LAW CLAIMS ARE PROPERLY BEFORE THIS COURT AND STATE VIABLE CAUSES OF ACTION

Defendants challenge Dr. Gorman's state law claims on three grounds: (1) improper service under the Maryland Tort Claims Act ("MTCA"); (2) the breach of contract claim is time-barred; and (3) individual defendants are entitled to state personnel immunity. Def. Mem. at 13-14. Each of these arguments fails.

Moreover, Plaintiff has contemporaneously filed a Motion for Declaration of Good Cause Pursuant to Md. Code, State Gov't § 12-106(c), which is incorporated herein by reference and addresses Defendants' MTCA service arguments in full. That motion establishes on two independent grounds that the MTCA's written-notice requirement does not bar Dr. Gorman's state tort claims. Under § 12-106(c)(2), the State had actual and constructive notice of Dr. Gorman's injury through multi-channel communications including Dr. Gorman's written whistleblower complaint to University President Schatzel, Provost Perreault, University Counsel, and HR Director Jones (Compl. ¶59) and his direct written complaint to the Governor's Office (Compl. ¶63)—all before or within one year of his termination — exempting Plaintiff from the written-notice requirement entirely. Under § 12-106(c)(1), good cause exists because Towson's own unconstitutional severance condition created a reasonable and well-founded fear that filing a formal Treasurer notice would trigger forfeiture of guaranteed severance compensation, and the

19

State suffered no prejudice. All three of Dr. Gorman's state law claims — Count III (Wrongful Termination in Violation of Public Policy), Count IV (Breach of Contract), and Count V (Negligent Misrepresentation) — survive Defendants' motion.

### A.  **Dr. Gorman Properly Effected Service Under the MTCA**

Defendants contend that service was not properly effected on the State Treasurer as required by Md. State Gov't § 12-108(a). This argument is without merit. On January 13, 2026 — within the timeframe ordered by this Court, Plaintiff served the State Treasurer via email to the address provided by AAG Hummel, and the Treasurer's Office provided written acceptance of service that same day. ECF No. 13. Even if technical defects existed in the December 22, 2025 physical service attempt (ECF No. 14), those defects were cured by the January 13 email service and written acceptance.

Importantly, the Attorney General's Office had actual notice of all claims since October 2025, when it accepted service on behalf of Towson and all individual defendants and AAG Handley specifically acknowledged the Treasurer notice requirement. ECF No. 12. The OAG responded to Plaintiff's counsel's March 2024 demand letter in ten days, accepted service in October 2025, and filed a substantive Motion to Dismiss in February 2026 — all without ever identifying any specific prejudice from any service deficiency. That the OAG also secured representation agreements from all eleven individual defendants within days of being contacted further demonstrates that the State retains full ability to communicate with and obtain cooperation from the relevant witnesses — the same cooperation that would be required for any investigation or discovery the State contends was prejudiced by the absence of formal Treasurer notice. Defendants have suffered no prejudice from any technical deficiency, and dismissal is unwarranted.

B. **The Breach of Contract Claim Presents Factual Questions Inappropriate for Resolution at the Pleading Stage**

Defendants argue that Dr. Gorman's breach of contract claim (Count IV) is time-barred under Md. State Gov't § 12-202. Def. Mem. at 14. This argument is premature, as it requires factual determinations regarding when the claim accrued and whether equitable tolling applies that cannot be resolved on a motion to dismiss. The ART Policy breaches alleged span from February 2022 (improper PTR committee composition) through September 2022 (coercive conditioning of compensation), with termination effective October 21, 2022. Compl. ¶¶32-61. Whether the claim accrued at the final breach, at the effective termination date, or whether equitable tolling applies based on Towson's coercive conditioning of guaranteed compensation on non-pursuit of legal remedies — which effectively created a chilling effect on pursuing the contractual right to a hearing during the very period when the limitations clock was running — presents factual questions that cannot be resolved at the pleading stage. Limitations is an affirmative defense that Defendants bear the burden of establishing. *Christian*, 817 F. Supp. at 1285 n.8. Defendants cannot meet that burden here.

C. **Individual Defendants Are Not Entitled to State Personnel Immunity**

Maryland state personnel immunity does not apply where the defendant acted with malice or gross negligence. Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). Plaintiff has adequately alleged both. The deliberate placement of the specific faculty members he had accused of misconduct onto his evaluation committee "only months" after his complaints (Compl. ¶123) constitutes malice: "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018). Professor Manasse's explicit threat that "anyone who goes against the department will never see a pay

21

increase for the rest of their life" (Compl. ¶27), the committee's unanimous "unsatisfactory" finding in deliberate disregard of required ART Policy terminology (Compl. ¶68.c), Provost Perreault's campus ban without policy authority (Compl. ¶52), and President Schatzel's conditioning of guaranteed compensation on waiver of appeal rights (Compl. ¶60-61) all demonstrate gross negligence and malice. Whether these defendants acted with the requisite intent is a fact-intensive inquiry inappropriate for resolution at the pleading stage, and discovery is needed to fully develop the extent of coordination among them. See *Christian v. Cecil County*, 817 F. Supp. at 1289.

### D. Dr. Gorman Has Stated a Viable Claim for Wrongful Termination in Violation of Public Policy

Defendants contend that Dr. Gorman's wrongful termination claim (Count III) fails because he has not identified a clear mandate of public policy or established a nexus between his conduct and termination. Def. Mem. at 19-20. Maryland law permits a wrongful discharge claim where a discharge violates a clear mandate of public policy and there is a nexus between the employee's conduct and the employer's decision to fire the employee. *King v. Marriott Int'l Inc.*, 160 Md. App. 689, 700-01 (2005); *Adler v. Am. Standard Corp.*, 291 Md. 31, 35–36 (1981). The elements are satisfied here.

The public policy at issue is not vague or aspirational. Maryland has expressed, through at least four independent and overlapping sources, an unmistakable policy against retaliating against state university employees who report institutional corruption to state authorities. First, the Maryland Whistleblower Law, Md. Code Ann., SP&P §§ 5-301 and 5-305, prohibits any supervisor from taking personnel action as reprisal against an employee who discloses information that the employee reasonably believes evidences abuse of authority, gross mismanagement, or

22

gross waste of money. A parallel provision for USM employees exists in Md. Code Ann., Educ. Art. § 13-201. Two overlapping statutory whistleblower regimes applicable to this Plaintiff admit no argument that Maryland's public policy on this point is unclear.

Second, the Maryland Public Ethics Law, Md. Code Ann., Gen. Prov. §§ 5-501 and 5-509, prohibits state officials from participating in matters in which they have a personal interest and expressly bars retaliation against employees who report ethics violations or participate in ethics investigations. Plaintiff's foundational complaint was that search committee members had undisclosed conflicts of interest in the faculty hiring process. His reports to the Governor's Office and through EthicsPoint were activity expressly protected by § 5-509's anti-retaliation provision.

Third, the Maryland Declaration of Rights, Article 40, declares that "every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects." A state employer cannot terminate a citizen-employee for exercising the right Maryland's own Constitution declares inviolable. Finally, the University System of Maryland enabling statute, Educ. Art. § 12-101, establishes that Maryland's public universities exist to advance knowledge and serve the public interest. Dr. Gorman's reports of corrupt hiring practices served — rather than undermined — that mission. Compl. ¶¶99-101.

The nexus between Dr. Gorman's protected activity and his termination is evident from both temporal proximity and the deliberate composition of his evaluation committee. He reported self-dealing in January 2021 (Compl. ¶¶18, 38-39), filed additional complaints in February and April 2021 (Compl. ¶¶22, 25, 43), and submitted an EthicsPoint complaint in May 2021 (Compl. ¶26). The exact same faculty members he accused were appointed to evaluate his employment at the next review opportunity. Compl. ¶¶111, 123. Professor Manasse's explicit threat — "anyone who goes against the department will never see a pay increase for the rest of their life" (Compl.

¶27) — directly establishes retaliatory motive. Whether these facts ultimately establish a causal nexus is a question for the factfinder, not resolution on a motion to dismiss. Therefore, the Court should deny Defendants' motion to dismiss Count III.

Plaintiff's Count V (Negligent Misrepresentation) is likewise viable and is not challenged on any ground specific to its substantive elements. To the extent Defendants' MTCA service and immunity arguments were intended to sweep Count V into their motion, those arguments fail for the reasons set forth above.

## VII.   IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND

Should the Court find any deficiency in any of Dr. Gorman's claims, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). Leave to amend should be "freely give[n] when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962)(quoting FRCP 15(a)). The Supreme Court has identified only a narrow set of circumstances justifying denial — "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment." *Id.* None of those circumstances are present here. This case is at the pleading stage; no discovery has occurred; no prior amendment has been sought; and Defendants have been on notice of the factual basis for all claims since at least October 2025. Amendment would not be futile, and Defendants would suffer no prejudice. Dismissal with prejudice of any claim on a record that could be cured by amendment is not warranted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court enter an Order: (1) Denying Defendants' Motion to Dismiss in its entirety; (2) Denying the Motion to Dismiss for

lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1); (3) Denying the Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); (4) Ordering Defendants to file an Answer to the Complaint within the time permitted by the Federal Rules of Civil Procedure; (5) Granting Plaintiff leave to amend the Complaint should the Court identify any deficiency that can be cured by amendment; and (6) Granting such other and further relief as the Court deems just and proper.

Dated: March 10, 2026                         Respectfully Submitted,

                                              /s/ Katherine Patton

                                              Katherine Patton, Esq.

                                              Maryland Bar Attorney ID: 2112140039
                                              Fed. Bar No. 30693
                                              Quinn Patton, LC
                                              838 Ritchie Highway, Suite 4
                                              Severna Park, MD 21146
                                              (443) 247-5444
                                              katpatton@quinnpatton.com
                                              www.quinnpatton.com

                                              *Attorney for the Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of March, 2026, a copy of this Plaintiff's Opposition to Defendants' Motion to Dismiss was served electronically via the Court's ECF system upon:

Kathryn Hummel
Assistant Attorney General
Federal Bar No. 21991
200 St. Paul Place, 17th Floor

Baltimore, Maryland 21202
khummel@oag.maryland.gov

Respectfully,

 /s/ Katherine Patton

Katherine Patton